Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Kyle P. Quackenbush (State Bar No.322401)
Anupama K. Reddy (State Bar No. 324873)
**JOSEPH SAVERI LAW FIRM, INC.**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
kquackenbush@saverilawfirm.com
areddy@saverilawfirm.com

W. Joseph Bruckner (MN #147758)
  (*pro hac vice to be submitted*)
Heidi M. Silton (MN #025759X)
  (*pro hac vice to be submitted*)
Craig S. Davis (MN#0148192)
  (*pro hac vice to be submitted*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (651) 339-0981
Email: wjbruckner@locklaw.com
hmsilton@locklaw.com
csdavis@locklaw.com

*(Additional counsel on signature page)*

*Attorneys for Individual and Representative Plaintiff*
*Mallory Flannery*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MALLORY FLANNERY,** <br>                Individual and Representative <br>                Plaintiff, <br><br> v. <br><br> **ALTRIA GROUP, INC., AND JUUL LABS, INC.,** <br><br>                Defendants. | Case No. <br><br> **ANTITRUST CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Mallory Flannery, on behalf of herself and all others similarly situated, brings this Class Action Complaint against Altria Group, Inc. and Juul Labs, Inc. for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18, as follows:

## I.    INTRODUCTION

1.    Defendants in this antitrust class action illegally agreed that Altria Group, Inc. ("Altria") would invest $12.8 billion in Juul Labs, Inc. ("Juul") and stop competing with Juul in the market for closed-system electronic cigarette ("e-cigarettes"). Altria's sudden and collusive departure from the market, along with its marketing and distribution support for Juul, allocated the market for e-cigarettes to Juul, unlawfully increasing its market power.

2.    Altria was an established incumbent firm in the nicotine and tobacco field. Its Marlboro product was the biggest selling cigarette for over 45 years. During the last decade, declining traditional tobacco sales encouraged Altria's interest in new vapor-based nicotine products. In 2013, Altria began e-cigarette work, bringing its MarkTen e-cigarette to market. By mid-2017, the MarkTen gained the second highest share of this market.

3.    Meanwhile, Juul entered the e-cigarette market with a splash, launching its new, closed-system Juul product in 2015. Juul's growing sales captured first-place e-cigarette market share by January 2018, challenging Altria's market share.

4.    Altria had spent over $100 million acquiring other platforms in this market, and sought simply to buy Juul and make it part of its Altria portfolio. But Juul's executives intended to dominate the e-cigarette market, and demanded that Altria cede that market to Juul in order to do business with Juul.

5.    After months of fitful negotiations, Altria agreed to Juul's demand. Juul and Altria reached an anticompetitive agreement in which Altria bought a 35% interest in Juul for a generous $12.8 billion. In return, Altria walked away from its own e-cigarette business and stopped competing with Juul.

6.    Altria's and Juul's agreement eliminated current competition between two leading e-cigarette manufacturers, and ended Altria's efforts to innovate and create new products in this area.

After the agreement, Juul dominates the e-cigarette market, newly staffed with Altria executives. Altria continues to pursue traditional tobacco sales, and has thrown its marketing weight behind Juul, sharing shelf space at its many retail channels, and initiating other co-marketing tactics.

7.    Plaintiff seeks damages and injunctive relief for Defendant's concerted restraint of trade that harms Plaintiff and the Class.

## II.    JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

8.    Plaintiff brings this action on its own behalf as well as that of the Class to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' violations of Sections 1 and 2 of the Sherman Act, (15 U.S.C. §§ 1 & 2), and Section 7 of the Clayton Act, 15 U.S.C. § 18, as well as any and all equitable relief that those federal laws provide to Plaintiff and the Class.

9.    Jurisdiction and venue are proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. § 1391(b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and one or more of the Defendants reside in this District or are licensed to do business in this District.  Each Defendant has transacted business, maintained substantial contact, and committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including this District.  Defendants' scheme and conspiracy have been directed at and have had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including this District.  The Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy for the Class exceeds $5,000,000, and there are members of the Class who are citizens of a different state than the Defendants.

10.    Pursuant to Civil Local Rule 3.2 (c) and (d), assignment of this case to the San Francisco Division of the United States District Court for the Northern District of California is proper because the interstate trade and commerce involved and affected by Defendants' violations of the antitrust laws in this case was substantially conducted with, directed to, or affected Plaintiff and

members of the Class in counties located within that Division.  Furthermore, Juul's headquarters and principal place of business are located within this Division.

### III.    PARTIES

#### A.  Plaintiff

11.    Plaintiff Mallory Flannery ("Plaintiff") is a resident of the State of Iowa.  Plaintiff purchased Juul products directly from Juul during the relevant period.  Plaintiff was injured in connection with her purchases within the Class Period as a result of Defendants' anticompetitive and unlawful agreements alleged herein.

#### B.  Defendants

12.    Defendant Juul Labs, Inc. ("Juul") is a Delaware corporation with its principal place of business at 560 20th Street, San Francisco, California.  Juul is the leading manufacturer of closed-system e-cigarettes, generating over $1 billion in sales in 2018.  During the Class Period, Juul sold e-cigarettes directly or through its subsidiaries, agents and affiliates to purchasers throughout the United States.  Juul is a party to the anticompetitive and unlawful agreements alleged herein.

13.    Defendant Altria Group, Inc. ("Altria") is a Virginia corporation with its principal place of business at 6601 West Broad Street, Richmond, Virginia.  Altria is one of the country's largest tobacco companies and before the anticompetitive agreements alleged in this complaint, it manufactured and sold closed-system e-cigarettes in competition with Juul.  Altria is a party to the anticompetitive and unlawful agreements alleged herein.  Prior to those anticompetitive and illegal agreements, Altria manufactured, sold and marketed e-cigarettes under the brand names MarkTen, MarkTen Elite, and Green Smoke.  In 2018, Altria generated over $24 billion in sales from its traditional tobacco products and its e-cigarette products.

#### C.  Agents and Co-Conspirators

14.    Each Defendant authorized, ordered, or performed the unlawful and anticompetitive acts alleged herein by and through its respective officers, agents, employees or representatives while they were actively engaged in the management, direction, or control of that Defendant's businesses or affairs.

15.     Each Defendant's corporate family in this case acted as a single enterprise with the parent corporations exercising substantial control over their subsidiaries.

16.     The high-ranking managers who committed the anticompetitive misconduct alleged herein acted for Defendants' top-level legal entities and bound the entire corporate family.

17.     Various persons or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance of the conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not the Complaint names the co-conspirators.

18.     Each Defendant acted as the principal, agent, partner, or joint venturer for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

## IV.   FACTUAL ALLEGATIONS

### A.  Industry History and Juul and Altria's Former Competition

19.     Altria estimated in 2019 that 12 million adults use e-cigarettes in the United States. Many are cigarette smokers seeking a less harmful nicotine dose.  Others are teenagers just experimenting or starting to smoke.  The gradual decline of traditional burned or "combustible" tobacco cigarettes gave rise to electronic cigarettes, and Juul's challenge to incumbent cigarette makers such as Altria.

20.     In 1968, roughly 42% of Americans smoked, often in restaurants, bars, and airplanes. "Tobacco was glamorously portrayed in the movies and on TV and advertised on billboards lining the highways."[1]

21.     The first report of the Surgeon General in 1964 concluded that cigarette smoking was a cause of lung cancer in men and probably in women, and the most important cause of chronic bronchitis.  The 2006 report of the Surgeon General concluded that second-hand smoke causes disease and premature death in children and adults who do not smoke.  It also concluded that such exposure

---

[1] *Smoking in America:  Why More Americans Are Kicking the Habit*, American Heart Assn News (Aug. 30, 2018), https://www.heart.org/en/news/2018/08/29/smoking-in-america-why-more-americans-are-kicking-the-habit (accessed April 18, 2020).

has immediate adverse effects on the cardiovascular system and causes coronary heart disease and lung cancer.

22.     After these and other reports, anti-smoking campaigns, smoke-free laws, anti-smoking advertising, and access to cessation programs de-normalized tobacco use and made initial use more difficult for teenagers.[2]  Altria has explained that the combination of public policy and diminishing social acceptance of smoking resulted in decreased tobacco cigarette industry volume, which had been expected to continue.  Altria expected tobacco's long-term decline rate to run from 3.5% to 5% in 2019 to 2023.  Altria also suggested growth of the "e-vapor product category," mainly electronic cigarettes, could contribute to reductions in tobacco cigarette consumption levels and sales.

23.     Altria is a holding company.  Describing its tobacco business, Altria stated its subsidiaries' products include cigarettes, cigars, and pipe tobacco.  Its smokeless products included moist smokeless tobacco and "snus" products, "and innovative tobacco products, including e-vapor products."

24.     Altria's wholly owned subsidiary, Philip Morris USA, Inc., manufactures and sells Marlboros, the largest selling cigarette brand in the United States for over 45 years.  Philip Morris USA, Inc. is the largest cigarette company in the United States.[3]  Before Defendants' anticompetitive agreement, Altria's wholly owned subsidiary Nu Mark LLC "was engaged in the manufacture and sale of innovative tobacco products," mainly Altria's MarkTen and MarkTen Elite products.

25.     The first commercially successful electronic cigarette was created in China in 2003 by Hon Lik, a pharmacist, and sold internationally by Golden Dragon Holdings, later renamed Ruyan. Electronic cigarettes were introduced to the United States in 2006.

26.     Electronic cigarettes typically contain a battery and heating element that vaporizes a liquid that usually contains nicotine, an addictive substance in cigarettes.  Inhaling through the mouthpiece triggers a sensor that activates the heating element.  The heating element vaporizes the

---

[2] *Id.;* Dennis Thompson, *U.S. Smoking Rate Hits New Low, But Vaping Rises*, WebMD (Nov. 14, 2019), https://www.webmd.com/smoking-cessation/news/20191114/fewer-americans-than-ever-smoke-but-vaping-poses-a-growing-threat-cdc#2 (accessed April 18, 2020).

[3] Altria Group, Inc., Annual Report (Form 10-K) 2 (Dec. 31, 2019).

CLASS ACTION COMPLAINT AND JURY DEMAND

liquid solution, creating an aerosol solution that the user inhales.  The solution, known as e-liquid or e-juice, comes in various flavors.

27.    When traditional tobacco cigarettes burn, they create inhalable smoke with about 7,000 products, around 70 of which are known carcinogens.  Electronic cigarettes assume tobacco combustion, rather than nicotine, causes most of the health issues associated with tobacco smoking.

28.    Altria noticed the growth and potential of the e-cigarettes market.  In 2013, it began marketing its MarkTen e-cigarette.  Over the next several years, Altria spent over $100 million acquiring other e-cigarette platforms to develop a portfolio of e-vapor products.

29.    Meanwhile, in 2007 Adam Bowen and James Monsees had launched Juul's predecessor, then known as Ploom, Inc.  In 2012, Ploom developed the Pax, an electronic cigarette about the size and shape of an iPhone, which sold for $250.  After selling the Ploom brand in 2015, Bowen and Monsees rebranded their company as Pax Labs, and began working on a new product, the Juul.  Pax Labs launched the Juul vaping device on June 1, 2015 at a launch party in New York City.  Other launch parties, Times Square billboards, and an Instagram-heavy social-media blitz accompanied the product's rollout.

30.    On July 1, 2017, Pax Labs spun Juul Labs, Inc. off as an independent company.  In December 2017, Kevin Burns became Juul's CEO.  Adam Bowen became Juul's Chief Technology Officer and a board member.  James Monsees became Juul's Chief Product Officer and a board member.  Juul's top executives told employees and investors that Juul's vaping products were safer than traditional cigarettes, and that Juul sought to take market share from "Big Tobacco" by developing alternative products.

31.    The Juul product has two components.  First, Juul uses disposable sealed pods pre-filled with a mixture of nicotine salt extracts, vaporizer carriers, and flavoring (which Juul collectively calls "e-liquid").  Second, like other e-cigarettes, Juul contains a vaporizing mechanism that rapidly heats the e-liquid, aerosolizing it for the user to inhale.  The sealed pod is inserted in the vaporizing device so the components can work together.

CLASS ACTION COMPLAINT AND JURY DEMAND

32.    The Juul was smaller than other vaping products at the time.  The black and grey rectangular product is about the size and shape of a long USB flash drive.  The company used focus groups to develop flavor strategies with tobacco, mint, fruit, and dessert profiles.  A Juul starter kit sold for approximately $20 and included a rechargeable Juul device, a USB charger, and four pods with the company's four main flavor profiles.  The flavor pods snapped in to the vaporizer, and could include added flavors such as mango and cucumber (until the FDA limited salable flavors).  A pack of flavor pods cost approximately $20, with each pod lasting for about 200 puffs, equal to one pack of tobacco cigarettes.

33.    Juul used nicotine salts as the core ingredient in its nicotine juice, an innovation in e-cigarettes.  Nicotine salts help the body absorb nicotine almost as quickly as tobacco smoke, which helped popularize the product.  The Juul's e-liquid contains 5% nicotine, a higher concentration than in most other commercially available e-cigarettes.  Other contents of Juul's vapor include benzoic acid, glycerin, and propylene glycol.  The device's light serves as a battery level indicator, and also lights up in a "party mode" display of rainbow colors when the device is waived around.

34.    The Juul device's physical design (including its circuit board) and its Juul pod determine the amount of aerosolized nicotine the Juul emits.  By altering the temperature, puff duration, airflow, and other elements, Juul can adjust the nicotine its product produces.

35.    Especially at first, Juul advertised on social media and other platforms, using social influencers and images of people in their 20s and 30s that appealed to teenagers.  Instagram and Twitter hashtags such as #Juul, #JuulTricks, and #JuulMemes took off.  Teenagers began to use the verb "Juuling" to describe using Juul.

36.    Juul's sales soared in 2017.  In January 2017, Juul had 25% of United States e-cigarette market share. [4]  By November 2017, Juul sold its first million units, and Neilson data indicated Juul had gained a third of the e-cigarette market.  Juul's substantial growth posed two problems for Altria.

---

[4] *Report:  Juul Leads Electronic Cigarette Category in the U.S.* (Jan. 11, 2018), Tobacco Business, https://tobaccobusiness.com/report-juul-leads-electronic-cigarette-category-us/ (accessed April 17, 2020).

First, Juul was grabbing market share in e-cigarettes.  Second, increased e-cigarette sales could potentially hasten the decline of traditional adult tobacco sales.

37.     However, Juul also presented an opportunity for Altria.  The United States Department of Health and Human Services has expressed "concern that e-cigarettes represent a gateway to the use of traditional cigarettes and other tobacco products."  For example, eighth grade students who vape e-cigarettes are ten times more likely to eventually smoke tobacco cigarettes than their classmates who do not use e-cigarettes.  "This suggests that adolescents who use e-cigarettes are likely to become tobacco cigarette smokers as they age."[5]

38.     At first, Altria continued to compete with Juul.  In February 2018, Altria introduced a pod-based product and began marketing it as MarkTen Elite.  That month Altria's then-COO (and later CEO) Howard Willard explained that Altria's subsidiary Nu Mark's goal was "to lead the U.S. e-vapor category with a portfolio of superior, potentially reduced-risk products that … generate cigarette-like margins at scale."

39.     At the beginning of January 2018, Juul's sales reached 46.8% of United States e-cigarettes.  Altria's MarkTen had 11.4% market share, and R. J. Reynolds' Vuse was at 20.7%.[6]  By May 2018, Juul reportedly had 64% of e-cigarette sales in stores Neilson tracked.[7]

40.     Altria had noted that other e-cigarettes had bursts of growth, but then their growth slipped.  Altria modelled Juul's growth path for some time, and found Juul regularly exceeded Altria's growth projections, showing consistent growth over three years.

41.     Juul remained concerned that Altria would use its tobacco business experience and substantial human and capital resources to compete vigorously on price and product innovation.  Along

---

[5] *Adolescents and Tobacco:  Trends*, Health and Human Services https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html (accessed April 19, 2020).

[6] *Report:  Juul Leads Electronic Cigarette Category in the U.S.* (Jan. 11, 2018), Tobacco Business, *supra*.

[7] Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, Wall St. J. (March 23, 2019), https://www.wsj.com/articles/why-marlboro-maker-bet-on-juul-the-vaping-upstart-aiming-to-kill-cigarettes-11553313678?mod=article_inline (accessed April 18, 2020).

CLASS ACTION COMPLAINT AND JURY DEMAND

those lines, Altria competed aggressively while attempting to acquire Juul. Juul declined Altria's initial overtures and competed in e-cigarettes, notably on prices.

### B. Defendants' Anticompetitive Agreement

42.     In further discussions during the summer of 2018 and following months, Juul asked Altria to reach an illegal and anticompetitive agreement to cede the market for e-cigarettes to Juul, and for Altria to stop competing with Juul in that market.

43.     Altria had offered to buy Juul outright in late 2017 or early 2018, informally suggesting as much as $8 billion. Juul had resisted these approaches, instead seeking Altria's withdrawal from the market.

44.     On July 30, 2018, Juul board member Nick Pritzker emailed an opening term sheet to Altria's CEO Howard Willard for their discussions. The term sheet included a non-compete term requiring Altria's withdrawal from the e-cigarette market.

45.     On August 1, 2018, top executives and board members from Juul and Altria met at the Park Hyatt Hotel in Washington, D.C., to discuss an arrangement between the companies. Kevin Burns, CEO, and Nick Pritzker and Riaz Valani, board members, represented Juul. Howard Willard, CEO, and Billy Gifford, CFO, represented Altria. The participants discussed business terms for an arrangement, including anticompetitive agreements not to compete. This meeting clarified to Altria's top executives that Altria would have to give up the e-cigarette business to reach an agreement with Juul.

46.     When Altria sought to modify Juul's proposed non-compete term, Juul insisted that Altria's exit from the e-cigarette market was a non-negotiable condition for any deal. On August 9, 2018, Billy Gifford sent a markup of the term sheet to Nick Pritzker, Riaz Valani, and Kevin Burns. Soon after that email, Juul's Riaz Valani met with Altria board member Dinny Divitre in New York on August 15, 2018, six days after Juul's board of directors meeting.

47.     On October 5, 2018, Altria's Howard Willard sent Nick Pritzker, Riaz Valani, and Kevin Burns a letter stating Altria would accept the non-compete term and could agree to exit the market. This letter restarted the stalled negotiations. Altria then began its market exit.

48.     On October 25, 2018, Altria announced it was halting the sale of some e-cigarettes, including its MarkTen Elite product.  Altria suggested a concern about regulatory pressure due to a surge in underage vaping.  Meanwhile, based on its discussions with Juul, Altria began removing its e-cigarettes from the market.  A few days later, Altria and Juul agreed on basic terms, including Altria's exit from the market.

49.     By December 7, 2018, Altria had been in the e-cigarette market for five years, launching two products, reaching second or third place in market share, and spending over $100 million to acquire other platforms to market e-cigarettes.  Despite those efforts and market share acquisition, Altria announced it was winding down its e-cigarette business, including its MarkTen product.

50.     Two days later, on December 9, 2018, Altria's General Counsel Murray Garrick emailed Jerry Masoudi, Juul's Chief Legal Officer, to discuss their deal.

51.     On December 20, 2018, within two weeks after Altria's announced withdrawal from the e-cigarette market, Juul and Altria signed agreements for Altria's purchase of newly issued Juul stock.  The agreements amounted to a 35% economic ownership interest in Juul in exchange for $12.8 billion in cash from Altria.

52.     Altria and Juul executed written agreements that day.  The overall agreement was structured in two steps to defer reporting to the Federal Trade Commission, despite or because of its anticompetitive nature.  The initial Purchase Agreement provided for Altria's $12.8 billion cash purchase of a 35% non-voting equity interest in Juul.  Altria purchased non-voting Class C-1 Common stock, which will convert to shares of voting Class C Common stock upon antitrust clearance.  Altria also received a security convertible into additional shares of Class C or C-1 Common stock upon settlement or exercise of certain other Juul convertible securities.  The agreement valued Juul at approximately $38 billion, more than twice Juul's previous reported value.

53.     The Purchase Agreement incorporates related agreements.  The other agreements include:  (i) a Relationship Agreement, (ii) a Services Agreement, (iii) a Voting Agreement, and (iv) an Intellectual Property License Agreement.

54.    The Relationship Agreement includes non-compete provisions, including one that states in relevant part:

> [Altria] shall not . . . directly or indirectly (1) own, manage, operate, control, engage in or assist others in engaging in, the e-Vapor Business; (2) take actions with the purpose of preparing to engage in the e-Vapor Business, including through engaging in or sponsoring research and development activities; or (3) Beneficially Own any equity interest in any Person, other than an aggregate of not more than four and nine-tenths percent (4.9%) of the equity interests of any Person which is publicly listed on a national stock exchange, that engages directly or indirectly in the e-Vapor Business (other than (x) as a result of [Altria's] Beneficial Ownership of Shares or (y) engagement in, or sponsorship of, research and development activities not directed toward the e-Vapor Business and not undertaken with the purpose of developing or commercializing technology or products in the e-Vapor Business) . . . . Notwithstanding the foregoing (x) [Altria] and its Subsidiaries and controlled Affiliates may engage in the business relating to (I) its Green Smoke, MarkTen (or Solaris, which is the non-U.S. equivalent brand of MarkTen) and MarkTen Elite brands, in each case, as such business is presently conducted, subject to Section 4.1 of the Purchase Agreement, and (II) for a period of sixty (60) days commencing on the date of this Agreement, certain research and development activities pursuant to existing agreements with third parties that are in the process of being discontinued . . . .

55.    Since Altria had removed all of its e-cigarette products from the market during the two preceding months, this provision committed Altria to shut down its e-cigarette business and participate in that market exclusively through Juul.

56.    The Services Agreement provided that Altria would provide certain services to Juul. Altria agreed to lease convenience store shelf space to Juul. Altria also agreed to provide regulatory, consulting, and distribution support. Altria also agreed to provide direct marketing support and sales service.

57.    The Relationship Agreement's non-compete term became effective in early 2019. The Services Agreement lasts for six years, absent material breach, insolvency, or a mutual agreement to end it. If the Services Agreement expires, Altria may discontinue the non-compete term. However, if the non-compete terminates, Altria will lose its right to appoint members to Juul's board of directors and Altria's pre-emptive right to maintain its 35% stake in Juul.

58.     The Intellectual Property License Agreement granted Juul a non-exclusive license to Altria's e-cigarette intellectual property.

59.     The Voting Agreement provided that after antitrust clearance, and conversion of Altria's shares, Altria can obtain seats on Juul's board of directors.

60.     The day Defendants signed these agreements, Altria's CEO Howard Willard stated that Altria had "taken significant action to prepare for Altria's future by investing $12.8 billion in Juul, a world leader in e-vapor." He added Altria was excited to support Juul's team "and offer our best-in-class services to build on their tremendous success." Willard mentioned Juul's "leading market position, brand equity and deep innovation pipeline" and Altria's strong retail presence, its sales organization, "which covers approximately 230,000 stores," and its regulatory expertise.

61.     After executing the transaction, Altria appointed its Chief Growth Officer, K. C. Crosthwaite, as its observer on Juul's board of directors. After Crosthwaite became Juul's CEO, Altria appointed its Chief Financial Officer and Vice Chairman to fill the observer position.

62.     On February 4, 2019, Altria and Juul filed for Hart-Scott-Rodino clearance to convert Altria's interest into voting securities (the "Antitrust Conversion") and to grant Altria permission to appoint three (of nine) members of Juul's board of directors, as provided by the Voting Agreement.

63.     In September 2019, Altria's K. C. Crosthwaite became Juul's CEO. Announcing Crosthwaite's new position, Juul noted he had overseen Altria's "expansion into alternatives to combustible cigarettes." Juul added that Crosthwaite and his leadership team "will continue a broad review of the company's practices and policies to ensure alignment with its aim of responsible leadership within the industry." Crosthwaite was a member of Altria's board from June 2018 to September 2019. Shortly after Crosthwaite's appointment, Altria's Joe Morillo, who previously ran Altria's e-cigarette business, became Juul's chief regulatory officer.

64.     On January 30, 2020, Juul and Altria announced amendments to their agreement, including an Amended Purchase Agreement, an Amended Services Agreement, and a Revised Voting Agreement.

65. Based on the Revised Voting Agreement, after the Antitrust Conversion, Altria will have the right to: (a) appoint two of nine Juul directors; (b) nominate one of three Juul independent directors; (c) appoint one of four Nominating Committee members for the board (with veto power); (d) appoint two of five members and the chair of a new Litigation Oversight Committee (to manage "Joint Litigation Matters" for both Altria and Juul); and (e) appoint one of three members of a Litigation Subcommittee (authorized to change Juul's senior outside counsel responsible for Joint Litigation Matters). The Revised Voting Agreement also granted Juul's CEO (by then Altria's K. C. Crosthwaite) (i) a board seat; (ii) a seat on the Litigation Oversight Committee; and (iii) a seat on the Litigation Subcommittee.

66. The Amended Relationship Agreement gives Altria the option to end the Non-Compete provision if federal law prohibits Juul from selling vaping products in the United States for at least a year or if Altria's internal valuation of the carrying value of its investment falls below 10% of its initial value of $12.8 billion.

67. The Amended Services Agreement eliminates all services except for regulatory support services. The amendment was effective at signing except for Juul's use of Altria's retail shelf space, which was set to expire after March 31, 2020.

68. Altria's investment in Juul and contemporaneous market exit eliminated Altria's current and future competition with Juul. Their agreement also eliminated Altria's efforts to develop and produce innovative new products. Altria also shared with Juul its extensive distribution capabilities and retailer shelf space, strengthening Juul's dominance of the e-cigarette market. As discussed later, this market's high regulatory barriers to new product entry intensify the anticompetitive effects of Defendants' unlawful agreement.

69. Consistent with Defendants' agreement to allocate the market, at the conference call announcing Altria's investment in Juul, Altria's CEO remarked that Altria felt "fortunate to be the tobacco company that's partnered up with Juul." He stated Altria expected its "strong distribution infrastructure to help accelerate [Juul's] financial performance." He also stated Altria planned "to

vigorously compete in the U.S. *cigarette* market, as well as the smokeless market and the cigar market." (emphasis added).

70.     Also consistent with their market allocation, Altria will provide Juul access to Altria's prime retail shelf space, which will cause Juul products to appear alongside Philip Morris combustible cigarettes like Marlboro, the country's most popular cigarette brand.  Altria can provide access to its nearly 230,000 retail locations.  Altria agreed to put Juul coupons on packs of Marlboros, encouraging customers to use or share e-cigarettes as well as traditional tobacco cigarettes.

71.     Defendants cannot show their anticompetitive agreement caused procompetitive benefits sufficient to outweigh the anticompetitive harm that Altria's collusive market exit causes. Nor can Defendants show pro-competitive benefits that could not have been achieved through less restrictive means.

### C. FTC's Action Challenging Defendants' Agreement

72.     Altria filed for Hart-Scott-Rodino clearance of Defendants' agreements on February 4, 2019 in order to convert Altria's purchased securities into voting shares and trigger other conversion effects.  In April 2019, the FTC sent Altria and Juul a "second request," which seeks additional information to review for merger or acquisition arrangements.  An agreement with the FTC extended the process.  On October 1, 2019, FTC issued a Civil Investigative Demand to Altria, among other things seeking information about Altria's role in the resignation of Juul's former CEO and Juul's hiring of any current or former Altria director, executive, or employee.

73.     On April 1, 2020, the FTC filed an administrative complaint against Altria and Juul under Sections 5(a) and (b) of the Federal Trade Commission Act, 15 U.S.C. § 45(a) & (b) and Section 11 (b) of the Clayton Act, 15 U.S.C. § 21(b), alleging the transaction violates Section 1 of the Sherman Act, 15 U.S.C. § 1, Section 5 of the FTC Act, 15 U.S.C. § 45, and Section 7 of the Clayton Act, 15 U.S.C. § 18.

74.     The FTC's complaint alleges Defendant's conduct unreasonably restrains competition. It further alleges Defendants' transaction substantially lessened competition in the United States

market for closed-system e-cigarettes by eliminating competition between Altria and Juul on price, innovation, promotional activity, and shelf space.

## V.    MARKET STRUCTURE AND THE AGREEMENTS' ANTICOMPETITIVE EFFECTS

### A.  Relevant Market

75.    The relevant product market for this action is the closed-system e-cigarette market.

76.    E-cigarettes are battery-powered devices that vaporize a liquid solution containing nicotine.  The two broad types of e-cigarettes are closed-systems and open-tank systems.  Closed-system e-cigarettes use a sealed pod or cartridge filled with an e-liquid (nicotine and likely flavoring and a vaporizer carrier).  Their second component is a device housing a battery and a heating mechanism; the cartridge or pod is inserted into this housing.  Examples of closed-system devices include "cigalikes," which generally resemble cigarettes in their size and shape, and pod-based products like Juul or MarkTen Elite, which look like rectangular USB drives.  Since the FDA's February 2020 flavor ban, closed-system pods and cartridges are only allowed in tobacco and menthol flavors.

77.    On the other hand, customers for open-tank e-cigarettes must manually fill a tank on the product with e-liquid.  Open-tank e-cigarettes allow a wider and more customizable experience because customers can experiment with different flavors and nicotine strengths, choosing and mixing various e-liquid components.  In addition, open-tank customers can customize the system's components, adjusting the battery, heating coil, and atomizer (which houses the heating coil).

78.    Closed-system e-cigarette manufacturers sell these products through different channels than do open-tank makers.  Most closed-system e-cigarettes are sold through a multi-outlet channel, primarily using convenience stores.  Convenience stores sell a limited range of e-cigarette products, focusing on the highest-volume brands.  In contrast, open-tank e-cigarette manufacturers sell their products almost exclusively through dedicated vape shops, retail outlets that typically carry extensive selections of open-tank parts and e-liquids.  The vape shops also provide more customer service than convenience stores.

79.    Defendants considered their respective Juul and MarkTen product lines to compete directly with each other and with other closed-system e-cigarettes.  Defendants set their prices based on competition with each other and with other closed-system products.  Defendants further acknowledged their closed-system products did not compete as closely with open-tank products.

80.    Closed-system e-cigarettes have no reasonable substitutes.  Closed-system e-cigarettes appeal to consumers because they are discreet due to their small size, and convenient due to their self-contained, ready-to-use format.  Open-tank e-cigarettes are not an adequate substitute for closed-system e-cigarettes because they are larger, more complex, and require more manual operation by the user.  Open-tank e-cigarettes generally appeal to a different customer type, one that appreciates their complexity and customizable nature.

81.    A hypothetical monopolist in the closed-system e-cigarette market would find it profitable to impose at least a small but significant and non-transitory increase in price.

82.    The relevant geographic market is no broader than the United States.  Because of FDA's requirements (described below), foreign firms cannot import e-cigarettes into the United States without prior FDA approval.

83.    According to Neilson data, the United States had approximately $2.8 billion in retail closed-system e-cigarette sales in 2018.

**B.    The E-Cigarette Market Structure Enhances The Violation's Effect**

> 1.    *Defendants' Agreement Enhanced Their Substantial Market Concentration and Presumptively Harmed Competition.*

84.    At the time of Altria's market exit, the relevant market was already highly concentrated.  Following Altria's exit, the relevant market's concentration significantly increased.

85.    Federal antitrust agencies measure industry concentration based on the Herfindahl-Hirschman Index ("HHI"), consistent with federal court decisions and federal Merger Guidelines.  Economists calculate the HHI by totaling the squares of the market shares of each firm in the relevant market.  Under the Merger Guidelines, a merger is presumed likely to create or enhance market

power—and is presumably illegal—when the post-merger HHI exceeds 2,500 and the merger increases the HHI by more than 200 points.

86.    In the United States market for closed-system e-cigarettes, Defendants' transaction resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. Defendants' transaction therefore resulted in a high concentration that establishes a presumption of competitive harm in the relevant market.

### 2.    *The E-Cigarette Market Has High Entry Barriers*

87.    Under the FDA regulatory framework, a new tobacco product's manufacturer, including for an e-cigarette, must submit to the FDA a Premarket Tobacco Product Application ("PMTA") and receive the FDA's approval before marketing that product.  An e-cigarette that was on the market before August 8, 2016, may remain on the market, but the manufacturer must file a PMTA by May 12, 2020, to continue marketing it, and must remove the product if FDA denies the PMTA. An e-cigarette that was not on the market before August 8, 2016, may not be marketed until it receives PMTA approval.  At the time Defendants signed their transaction papers, the deadline for an in-market applicant to file its PMTA was August 22, 2022.

88.    Preparing a PMTA requires substantial resources, including human resources, time, and money.  The cost can range from hundreds of thousands to millions of dollars per product.  Recent media and FDA attention to Juul's underage customers has likely increased the FDA's skepticism about new nicotine products.  The cost and delay of preparing a PMTA and the risk of its rejection in the current regulatory environment present high barriers to market entry for a prospective e-cigarette manufacturer.

89.    On January 2, 2020, the FDA announced a new enforcement policy, effective February 6, 2020.  The new policy prohibited all flavors for cartridge-based e-cigarettes until the product obtained a PMTA authorization, except for tobacco and menthol flavors.

### 3.    *Defendants' Agreement Enhanced Juul's Market Power*

90.    Throughout the Class Period, Juul dominated the relevant market and maintained power to control prices and exclude competition in that market.

91.     According to an August 2018 report on the tobacco industry, Juul had obtained 72.2% market share by August 2018.  Altria's market share then was 7.5%.  The following table shows how four manufacturer's market shares shifted by November 2018.

| | Market Share | |
|---|---|---|
| Manufacturer | August 2018 [8] | November 17, 2018 [9] |
| Juul Labs (Juul) | 72.2% | 76.1% |
| British American Tobacco / RJ Reynolds (Vuse) | 9.6% | 9.1% |
| Altria (MarkTen) | 7.5% | 4.3% |
| Imperial/Fontem Ventures (blu eCig) | 4.0% | 6.3% |

92.     Altria began removing its products from the market in October 2018.  By November 17, Altria's MarkTen market share had fallen to 4.3%, and Juul's had grown to 76.1%.

93.     By December 2018, Altria had entirely pulled its e-cigarette products from the market. Defendants' agreement eliminated one of Juul's major competitors, as well as giving Juul access to Altria's vast resources and substantial distribution system.

94.     As they intended, Defendants' transaction substantially increased Juul's market power in the relevant market.

---

[8] *Nielson:  Tobacco All Channel Data Thru 8/11 – Cig Vol Decelerates*, Exh. 13, Wells Fargo (Aug. 21, 2018), https://athra.org.au/wp-content/uploads/2018/09/Wells-Fargo-Nielsen-Tobacco-All-Channel-Report-Period-Ending-8.11.18.pdf (accessed April 20, 2019).

[9] Richard Craver, *Juul Expands to Top U.S. e-cig Market Share; Traditional Cigarettes Volume Continues to Slip,* Winston-Salem J. (Nov. 27, 2018), https://www.journalnow.com/business/juul-expands-top-u-s-e-cig-market-share-traditional/article_9bdfd55c-68b5-5c08-aeb8-edb4a616ca9e.html (accessed April 20, 2020).

CLASS ACTION COMPLAINT AND JURY DEMAND

### C. The Agreement's Anticompetitive Effects Outweigh Any Benefits

#### 1. Anticompetitive Effects

95.    Defendants' illegal agreement had the purpose and effect of raising prices, reducing output, reducing innovation and eliminating consumer choice.

96.    The purpose and effect of the illegal agreements was for Altria to withdraw from current and future competition in exchange for a share of the monopoly prices Juul would be able to charge, and the monopoly returns Juul would enjoy, due to its enhanced dominant position in the e-cigarette market that Defendants allocated to Juul.

97.    The transaction also closed routes to other potential acquisitions or partnerships through which Altria might have participated in the relevant market.

98.    Juul's and Altria's conduct as alleged herein had the purpose, capability, tendency, and effect of restraining competition unreasonably, and the transaction substantially lessened competition in the United States market for closed-system e-cigarettes, in the following ways, among others:

      a.    Eliminating Altria's competing products from the relevant market, including promotional activity to create awareness and drive sales, thereby eliminating current and future price competition between Juul and Altria;

      b.    Eliminating current and future innovation competition between Juul and Altria; and

      c.    Eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

99.    Altria's agreement to exit the e-cigarette market eliminated one of Juul's strongest rivals.  As a large, well-established, and well-funded company with longstanding relationships and substantial shelf space with retailers nationwide, Altria had resources and infrastructure to drive sales and compete aggressively.

100.    Altria leveraged its ownership of leading brands across multiple tobacco categories in order to secure substantial and favorable shelf space at retailers throughout the United States.  In 2018, for example, to Juul's alarm, Altria launched a major campaign to secure shelf space for its innovative

tobacco products (including e-cigarettes), offering retailers product discounts, slotting fees, and fixture payments.  After signing their agreements for this transaction, instead of competing for shelf space, Altria leased shelf space to Juul, effectively replacing its own MarkTen products with Juul's product.

101.    Before Altria shut down Nu Mark and MarkTen, Altria and Juul competed through product innovation, including device features and e-liquid formulations.  For example, Juul's success prompted Altria to acquire and further develop various pod-based e-cigarettes (including MarkTen Elite), and to commit substantial resources to developing e-liquid formulations with nicotine salts and higher nicotine concentrations.

102.    Altria's statements from before its agreement with Juul broadcast Altria's judgment that e-cigarettes represented tobacco's future and its commitment to be a part of that e-cigarette future. For example Altria's then-CEO Martin Barrington told the Consumer Analyst Group of New York in 2018 that "[w]e aspire to be the U.S. leader in authorized noncombustible, reduced risk products."[10] Altria's next CEO Howard Willard told The Wall Street Journal that if e-vapor was growing rapidly "and likely to cannibalize the consumers we have in our core business, if you don't invest in the new areas you potentially put your ability to deliver that financial result at risk."[11]  Altria had put its money where its mouth was, spending over $100 million to acquire various e-vapor platforms and intellectual property to compete in e-cigarettes, as well as developing MarkTen and MarkTen Elite and bringing them to market.

103.    Altria had once chased market share, competing through aggressive price promotions, product development, and incentives for shelf space.  But then Altria agreed to abandon its current and future competitive efforts in exchange for a substantial share of Juul's profits, resulting in Juul's enhanced market power and a substantially less competitive relevant market.

---

[10] Angel Abcede, *6 Elements of Altria's Tobacco Strategy*, CSP (March 6, 2018), https://www.cspdailynews.com/tobacco/6-elements-altrias-tobacco-strategy#page=0 (accessed April 19, 2020).

[11] Jennifer Maloney and Dana Mattioli, *Why Marlboro Maker Bet on Juul, the Vaping Upstart Aiming to Kill Cigarettes*, *supra*.

CLASS ACTION COMPLAINT AND JURY DEMAND

1                 2.  *Lack of Procompetitive Benefits*

2  104.  Defendants cannot demonstrate cognizable efficiencies that could rebut the

3  presumption that their conduct substantially lessened competition in the relevant market.  Defendants

4  also cannot demonstrate pro-competitive benefits of their conduct that could not have been achieved

5  through alternative means that would have been less restrictive to competition.

6  105.  Defendants cannot show that a new competitor's entry into the relevant market, or

7  existing competitors' expansion, would be timely, likely, or sufficient to offset their conduct's

8  anticompetitive effects.

9  106.  New competitive entry into the relevant market is unlikely because the regulatory

10 approval process is particularly expensive, long, and time-consuming.  Defendants themselves have

11 estimated that preparing a PMTA for an e-cigarette would require substantial time and investment.

12 107.  In addition to achieving regulatory approval, a new entrant would have to (a) develop

13 or acquire a product, (b) manufacture the product at scale with satisfactory quality, (c) develop a

14 distribution system, (d) develop a marketing plan, and (e) market and sell the product.  Selling the

15 product would likely require obtaining shelf space in retail outlets, and having to displace market

16 incumbents from that shelf space.

17 108.  Existing closed-system e-cigarette competitors cannot effectively replace the lost

18 competition because (i) they lack Altria's brand strength to secure favorable shelf space at retailers,

19 (ii) they lack the substantial resources Altria had at its disposal to commit to e-cigarette research and

20 development as well as pursuing regulatory approval, and (iii) the FDA's enforcement of restrictions

21 on e-liquid flavors has negatively impacted the competitive presence of competitors other than Juul,

22 which had earlier voluntarily discontinued its sweeter flavors.

23 109.  Open-tank e-cigarette manufacturers are not likely to replace the lost competition, in

24 part because FDA's PMTA deadline will likely cause many of them to close.  Further, such products

25 are typically sold through different marketing channels, such as vape shops.  Unfamiliar channels

26 would make it difficult to expand into convenience stores, which typically sell closed-system e-

27 cigarettes at retail.

28

110.    Defendants cannot demonstrate cognizable efficiencies sufficient to rebut the presumption that their transaction substantially lessened competition in the relevant market. Defendants also cannot demonstrate pro-competitive benefits of their conduct that could not be achieved through alternative, less restrictive means.

111.    Defendants' unlawful conduct eliminated competition in the relevant market and deprived Plaintiff and the Class of the benefits of free and unrestrained competition the antitrust laws were designed to provide.

## VI.    TRADE AND COMMERCE

112.    During the Class Period, each Defendant, directly or through its subsidiaries or other affiliates, sold e-cigarettes in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial District.

113.    During the Class Period, Defendants controlled a substantial share of the market for closed-system e-cigarettes in the United States.

114.    Defendants' business activities substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

## VII.    HARM TO COMPETITION AND ANTITRUST INJURY

115.    Defendants' agreement, combination and conspiracy as described in this complaint has had the following and other effects:

a.    Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

b.    Prices for e-cigarettes have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels; and,

c.    The supply of Defendants' e-cigarettes available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

1

## VIII.    CLASS ALLEGATIONS

2     116.    Plaintiff brings this action for damages and injunctive relief on behalf of herself and as

3  a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b) (2), and (b) (3) on behalf

4  of a similarly situated Class.  The Class is defined as follows:

5          All persons or entities in the United States that purchased e-cigarettes
           directly from Juul from December 7, 2018, through and until the
6          anticompetitive effects of Defendants' unlawful conduct cease (the
7          "Class Period").

8     117.    This definition excludes the following persons or entities:

9          a.   Any of the Defendants named in this complaint;

10         b.   Any of the Defendants' co-conspirators;

11         c.   Any of Defendants' parent companies, subsidiaries, and affiliates;

12         d.   Any of Defendants' officers, directors, managers, employees, subsidiaries,

13              affiliates or agents;

14         e.   Any governmental entities; and

15         f.   The judges and chamber staff in this case, as well as any members of their

16              immediate families.

17     118.    **Class Identity:**  The above-defined class is readily identifiable and ascertainable and

18  is a class for which identifying records should exist.

19     119.    **Numerosity:**  Plaintiff does not know the exact number of Class members, because

20  such information is in Defendants' exclusive control.  Plaintiff is informed and believes that, due to

21  the nature of the trade and commerce involved in this case, there are thousands of Class members and

22  that they are geographically dispersed throughout the United States, such that joinder of all Class

23  members in the prosecution of this action is impracticable.

24     120.    **Typicality**:  Plaintiff's claims are typical of the claims of fellow Class members

25  because Plaintiff directly purchased a Juul device from Juul.  Defendants damaged Plaintiff and all

26  Class members by their same wrongful conduct as alleged in this complaint, and the relief sought

27  herein is common to all members of the Class.

28

121.    **Common Questions Predominate:**  Numerous questions of law or fact common to the entire Class—including but not limited to those listed below—arise from Defendants' same anticompetitive and unlawful conduct:

      a.  Whether Defendants combined or conspired to fix, raise, maintain, or stabilize prices for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

      b.  Whether Defendants combined or conspired to divide or allocate the market for e-cigarettes sold at any time during the Class Period to purchasers in the United States;

      c.  Whether Defendants or either of them had market power with respect to the relevant market;

      d.  The definition of the relevant product market;

      e.  The definition of the relevant geographic market;

      f.  Whether Defendants' conduct caused the prices of e-cigarettes sold at any time during the Class Period to purchasers in the United States to be artificially fixed, raised, maintained, or stabilized at supracompetitive prices or price levels;

      g.  Whether Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate Class-wide measure of damages;

      h.  Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such relief.

122.    These and other questions of law and fact are common to the Class and predominate over any questions affecting the Class members individually.

123.    **Adequacy**:  Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff directly purchased e-cigarettes from one or more Defendants and has no conflicts

1    with any other members of the Class.  Plaintiff has also retained competent counsel who are

2    experienced in prosecuting antitrust class actions and other complex litigation.

3        124.  **Superiority:**  This class action is superior to alternatives, if any, for the fair and

4    efficient adjudication of this controversy.  The relatively small damages suffered by individual

5    members of the class compared to the expense and burden of individual prosecution of the clams

6    asserted in this litigation means that, absent a class action, it would not be feasible for members of the

7    Class to seek redress for the violations of law alleged in this complaint.  Further, individual litigation

8    presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay

9    and expense to all parties and to the court system.  Therefore, a class action presents far fewer case

10   management difficulties and will provide the benefits of unitary adjudication, economy of scale, and

11   comprehensive supervision by a single court.  There will be no material difficulty in the management

12   of this action as a class action.

13       125.  Defendants have acted on grounds generally applicable to the Class, thereby making

14   final injunctive relief appropriate with respect to the Class as a whole.

15       126.  The prosecution of separate actions by individual Class members would create the risk

16   of inconsistent or varying adjudications, establishing incompatible standards of conduct for

17   Defendants.

18                          **IX.    CLAIMS FOR RELIEF**

19                                **COUNT 1**
                    **Restraint of Trade Violating Sherman Act § 1, 15**
20                          **U.S.C. § 1 (All Defendants)**

21       127.  Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every

22   allegation set forth in the preceding paragraphs of this complaint.

23       128.  Defendants engaged in a continuing combination, conspiracy, or agreement to

24   unreasonably restrain trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,

25   by artificially reducing or eliminating competition with respect to the sale, marketing, and distribution

26   of e-cigarettes sold to purchasers in the United States.

27

28

129.    In particular, Defendants, formerly horizontal competitors, have combined and conspired to divide and allocate the market for e-cigarettes to raise, fix, maintain, or stabilize the prices of e-cigarettes sold to purchasers in the United States.

130.    These violations of Section 1 consisted of an unlawful agreement in which Altria agreed to withdraw from the relevant market and in exchange Juul sold Altria an interest in Juul's continuing business in the relevant market from which Altria withdrew.  The purpose of this agreement was to fix, raise, maintain, or stabilize prices of closed-system e-cigarette products in the relevant market as well as to stifle innovation.

131.    As a result of Defendants' unlawful conduct and acts taken in furtherance of their conspiracy, Altria removed competing products from the relevant market, thereby eliminating current and future price competition between Juul and Altria, including promotional activity to create awareness and drive sales.  Further, the unlawful conduct had the purpose and effect of eliminating current and future innovation competition between Juul and Altria, and eliminating current and future competition between Juul and Altria for shelf space at retailers through rebates and other incentives.

132.    For the purposes of formulating and effectuating their combination and conspiracy, Defendants did those things they conspired to do, including but not limited to (1) participating in meetings and conversations to eliminate competition from the market, (2) agreeing to allocate or divide the market for e-cigarettes between them, (3) closing Altria's e-cigarette business, (4) paying and accepting money for Altria's investment in Juul, and (5) moving former Altria executives over to influence Juul, and arranging for Altria to hold seats on Juul's board and important committees.

133.    Defendants' anticompetitive and unlawful conduct is illegal *per se*.

134.    Defendant's illegal agreement as alleged in this complaint has had the following effects, among others:

    a.    Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

b.  Prices for e-cigarettes have been raised, fixed, maintained, and
stabilized at artificial and non-competitive levels; and,

c.  The supply of Defendants' e-cigarettes available for sale during the
Class Period to purchasers in the United States has been artificially
and unjustifiably restrained.

135.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and other Class members were injured in their business or property.  Plaintiff and members of the Class have been injured by paying more for e-cigarettes than they would have paid in the absence of the combination and conspiracy.  These injuries are antitrust injuries flowing directly from the unlawful conduct alleged in this complaint, and are the kind of injuries the antitrust laws are meant to prevent.

136.    This offense is likely to continue unless injunctive relief is granted.

137.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this complaint.

**COUNT 2**
**Restraint of Trade Violating Clayton Act § 7,**
**15 U.S.C. § 18 (All Defendants)**

138.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

139.    The relevant product market for this claim is the closed-system e-cigarette market.  The relevant geographical market is the United States.

140.    As alleged above, Defendants or either of them possess substantial market power in the relevant product and geographical market.

141.    The agreement alleged herein, in which Altria acquired the stock, other share capital, or ownership interest in Juul, in return for which Altria withdrew its existing e-cigarettes from the market and halted innovation on future products, substantially lessened competition or tended to create a monopoly in the market for closed-system e-cigarettes in the United States.

142.    Altria now seeks to extend its illegal agreement with Juul by converting its nonvoting securities into voting securities and place members on Juul's board of directors.  This extension of

Altria's influence and merging of Defendant's organizations will further lessen competition or tend to create a monopoly in the market for closed-system e-cigarettes in the United States.

143.    Defendant's illegal agreement as alleged in this complaint has had the following effects, among others:

      a.  Competition in the e-cigarette market has been substantially lessened, and the Defendants' conduct has tended to create a monopoly in this market;

      b.  Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

      c.  Prices for e-cigarettes have been raised fixed, maintained, and stabilized at artificial and non-competitive levels; and,

      d.  The supply of Defendants' e-cigarettes available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

144.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.  Plaintiff and members of the Class have been injured by paying more for e-Cigarettes than they would have paid in the absence of the combination and conspiracy.  These injuries are antitrust injuries flowing directly from the unlawful conduct alleged in this complaint, and are the kind of injuries the antitrust laws are meant to prevent.

145.    This offense is likely to continue unless injunctive relief is granted.

146.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this complaint.

**COUNT 3**
**Conspiracy to Monopolize Violating Sherman Act §**
**2, 15 U.S.C. § 2 (All Defendants)**

147.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

148.    Beginning at a time unknown to Plaintiff, but at least as early as 2018 and continuing to the present, Defendants have conspired to monopolize the market for closed-system e-cigarettes through their anticompetitive agreements and related conduct described in this complaint, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

149.    The relevant product market for this claim is the closed-system e-cigarette market.  The relevant geographical market is the United States.

150.    As alleged above, Defendants or either of them possess substantial market power in the relevant product and geographical market.

151.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants did those things they conspired to do, including but not limited to (1) participating in meetings and conversations to eliminate competition from the market, (2) agreeing to allocate or divide the market for e-cigarettes between them, (3) closing Altria's e-cigarette business, (4) paying and accepting money for Altria's investment in Juul, and (5) moving former Altria executives over to influence Juul, and arranging for Altria's seats on Juul's board and important committees.

152.    Defendants' anticompetitive conduct has no legitimate business purpose or pro-competitive effect.

153.    Defendants engaged in this anticompetitive conduct with specific intent to monopolize the above-described product and geographical relevant market.  More specifically, Defendants acted intending to create, enhance, and maintain a monopoly over the market for closed-system e-cigarettes. Defendants agreed on and acted with unity of purpose, common design and understanding, and a conscious commitment to this common scheme to occupy and control the relevant market.

154.    Defendants' anticompetitive conduct has diminished, and continues to diminish, competition in the market for closed-system e-cigarettes, to the detriment of Plaintiff and members of the Class.

155.    As a result of Defendants' anticompetitive conduct, there is a dangerous probability that they will monopolize the market for closed-system e-cigarettes.

156.    Defendant's illegal agreement as alleged in this complaint has had the following effects, among others:

      a.   Price competition among Defendants in the sale, marketing and distribution of e-cigarettes during the Class Period to purchasers in the United States has been restrained;

      b.   Prices for e-cigarettes have been raised, fixed, maintained, and stabilized at artificial and non-competitive levels; and,

      c.   The supply of Defendants' e-cigarettes available for sale during the Class Period to purchasers in the United States has been artificially and unjustifiably restrained.

157.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and class members were injured in their business or property.  Plaintiff and members of the Class have been injured by paying more for e-Cigarettes than they would have paid in the absence of the combination and conspiracy.  These injuries are antitrust injuries flowing directly from the unlawful conduct alleged in this complaint, and are the kind of injuries the antitrust laws are meant to prevent.

158.    This offense is likely to continue unless injunctive relief is granted.

159.    Plaintiff and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged in this complaint.

## COUNT 4
### Declaratory and Injunctive Relief For Conduct Violating Sherman Act §§ 1 & 2 and Clayton Act § 7, 15 U.S.C. §§ 1, 2, 18 & 26 (All Defendants)

160.    Plaintiff incorporates and re-alleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this complaint.

161.    Plaintiff seeks declaratory and injunctive relief based on the federal antitrust laws and 28 U.S.C. § 2201.

162.    Plaintiff's allegations described in this complaint show violations of Sections 1 and 2 of the Sherman Act.

CLASS ACTION COMPLAINT AND JURY DEMAND

163.   Defendants agreed on and effectuated a scheme to restrain trade and substantially lessen competition in the United States market for closed-system e-cigarettes.

164.   Defendants have no legitimate, non-pretextual, pro-competitive business justification for their conduct that outweighs its harmful effect.

165.   As a direct and proximate result of Defendants' anticompetitive scheme, as alleged in this complaint, Plaintiff and the Class were harmed as described.

166.   Defendants' goal, purpose, and effect for their scheme was to prevent and delay competition in order to charge supracompetitive prices for e-cigarettes, preferably without a substantial loss of sales revenue.

167.   The anticompetitive agreements alleged in this complaint should be declared invalid, illegal, and unenforceable.

168.   Plaintiff and the Class have been injured in their business or property by reason of Defendants' antitrust violations alleged in this Count.  Their injury consists of paying higher prices for e-cigarettes than they would have paid in the absence of these violations.  These injuries will continue unless halted.

169.   Plaintiff and the Class, pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

170.   Plaintiff and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct.

## X.    DEMAND FOR JUDGMENT

171.   WHEREFORE, Plaintiff, on behalf of herself and the Class of all others similarly situated, respectfully request judgment against Defendants, by adjudging and decreeing as follows:

    a.  This action may be maintained as a class action under Rule 23(a), (b) (2), and (b) (3) of the Federal Rules of Civil Procedure, appointing Plaintiff as a class representative and Plaintiff's counsel of record as class counsel, and directing

that notice of this action, as provided by Rule 23 (c) (2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

b. Defendants have combined and conspired in violation of Section 1 and 2 of the Sherman Act, 15 U.S.C. § 1 & 2, and that Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

c. Defendants have combined in a way that substantially lessened competition or tended to create a monopoly in the market for closed-system e-cigarettes in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Plaintiff and the Class have been injured in their business and property as a result of Defendants' violations;

d. Plaintiff and the Class are entitled to recover damages they sustained, as provided by the federal antitrust laws under which relief is sought herein, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount subject to proof at trial, which is to be trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 18;

e. Plaintiff and the Class are entitled to pre-judgment and post-judgment interest on the damages awarded them, at the highest legal rate, beginning on the date this complaint is first served on Defendants;

f. Plaintiff and the Class are entitled to equitable relief appropriate to remedy Defendants' past and ongoing restraint of trade, including:

   i. A judicial determination declaring the rights of Plaintiff and the Class, and the corresponding responsibilities of Defendants;

   ii. Issuance of a permanent injunction against Defendants and their parents, subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf from

1     continuing and maintaining the conspiracy or agreements alleged

2     herein; and

3         iii.   Divestiture of Altria's equity stake in Juul and rescission of Altria's

4             purchase of that stake;

5     g.  Plaintiff and the Class recover their costs of this suit, including reasonable

6         attorneys' fees as provided by law; and

7     h.  Plaintiff and the Class receive such other or further relief as may be just and

8         proper.

9                     XI.    DEMAND FOR JURY TRIAL

10        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all the

11    claims asserted in this Complaint so triable.

12

13   Dated: April 27, 2020                 Respectfully submitted,

14                                    */s/ Joseph R. Saveri*
                                      Joseph R. Saveri

15
                                      Joseph R. Saveri (State Bar No. 130064)
16                                    Steven N. Williams (State Bar No. 175489)
                                      Kyle P. Quackenbush (State Bar No.322401)
17                                    Anupama K. Reddy (State Bar No. 324873)
                                      **JOSEPH SAVERI LAW FIRM, INC.**
18                                    601 California Street, Suite 1000
                                      San Francisco, California 94108
19                                    Telephone:   (415) 500-6800
                                      Facsimile:   (415) 395-9940
20                                    Email: jsaveri@saverilawfirm.com
                                          swilliams@saverilawfirm.com
21                                        kquackenbush@saverilawfirm.com
                                          areddy@saverilawfirm.com
22
                                      W. Joseph Bruckner (MN #147758)
23                                      (*pro hac vice to be submitted*)
                                      Heidi M. Silton (MN #025759X)
24                                      (*pro hac vice to be submitted*)
                                      Craig S. Davis (MN#0148192)
25                                      (*pro hac vice to be submitted*)
                                      **LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
26                                    100 Washington Avenue South, Suite 2200
                                      Minneapolis, MN 55401
27                                    Telephone:   (612) 339-6900
                                      Facsimile:   (651) 339-0981
28

                                        33

Email: wjbruckner@locklaw.com
       hmsilton@locklaw.com
       csdavis@locklaw.com

J. Barton Goplerud
**SHINDLER, ANDERSON, GOPLERUD &
WEESE, P.C.**
5015 Grand Ridge Drive, Suite 100
West Des Moines, Iowa 50265
Telephone:   (515) 223-4567
Facsimile:    (515) 223-8887
Email: goplerud@sagwlaw.com

*Attorneys for Individual and Representative Plaintiff
Mallory Flannery*

34